The next case, excuse me, for argument is in Re the Marriage of Groshans. Counsel, whenever you're ready, you may proceed. My name is Julian Wood. I'm here as the counsel for Petitioner Angela Groshan. She is the I'm here today to present several points of appeal in regard to the award of child custody by the trial court in Madison County, Illinois. And just to open up, proceed with my very first point, which, which regard, related to the motion to reopen proofs. In our brief, we've argued that this, that motion to reopen proofs, the granting of that was an abuse of discretion and that it was beyond the reason of the court to do so. There are four primary factors in awarding, you know, reopening, or in the court's consideration of opening, reopening a motion for proofs. Two of these, which I felt were important for this particular matter. Two, the second point, which would be the adverse party being surprised or unfairly prejudiced by the motion for reopening proofs, or that there's no cogent reason for, exists to deny the motion to reopen proofs. The motion itself alleged false allegations by mother against father in regard to abuse of the minor child. And the allegations are throughout the record, and I'm sure the court has had an opportunity to review those allegations in depth. Basically, prior to the court granting this motion, the court had heard evidence of at least two different hearings that there were mandated reporters that had made these reports to the authorities, that these allegations never specifically been made by mom, that Did you slow down a little bit? Yes, I'm sorry. I apologize. I did get going. I did get going. Did you do bathe in high school? Yes, I did. I know. I know you did. Yeah. Okay. Anyway, I apologize. Back up a little bit. You can't do speed and spread here. This is true. This is true. So, thank you. When mother, I mean, what mother had, one of them basically only reported what it was that the child had reported to the authorities. So there was never any specific allegations by mother that she making these views was just always what was reported by the child. That being the case, there didn't really exist a cogent reason for the court to grant this motion to reopen proofs. Mother, additionally, by reopening it, by the court acknowledging that these allegations were not false, that they had been made by mandated reporters, were then prejudiced by reopening this matter to consider evidence that, I think mandated reporters, this was not an issue where there was an allegation of false allegations. Again, mandated reporters. The second point that I have on appeal is in regard to the testimony of Dr. Knutson. And while it may seem like a small point, it was very relevant in this particular case due to the consistent testimony and findings made by Dr. Tompkins as well as statements made by father during the course of the litigation as to the reason that the child was sick. Dr. Tompkins in her custody evaluation had indicated that father had some outdated beliefs in regard to psychosomatic illness and the reasons for that. In other words, father's belief was that mother was causing the illness. Dr. Knutson's testimony was important and his statement, which was disregarded by the court, was important because Dr. Knutson indicated that there was no indicia the child was being overmedicated. She did have this condition. It was a bona fide condition. She did have these infections and she was outgrowing them and that was an important factor and that was an important thing. But she did have this bona fide condition and so that piece of evidence, that testimony offered by Dr. Knutson, was very important in this particular case. Opposing counsel had made no objection at the evidentiary deposition. The objection was raised only at trial, at the initial trial. Therefore, I believe it would be an abuse of discretion for the trial court to disregard that statement when no objection was timely made at the time of that deposition. Can you answer a question for me, please? Yes. This trial was held on March 12th and 13th of 2012. Correct. Seventeen months go by, right? And you still have no day-to-day rule. What's going on in Madison County? I do not know, Your Honor, and I think this was not my original case, unfortunately. Okay, because here's my problem. I understand your motion to reopen, but that was a motion that was just aimed at refuting some allegations about abuse. Correct. Right? So once that was done, it was done. But then in the record, on August 8th, I see an order requiring the child to attend Edwardsville Schools. No motion. How did that happen? I'm unclear. At that time, I was not counsel of record. Well, how are people getting before the court? Unfortunately, I believe in this particular case, in particular, the order of protection, for example, that was filed by father. That was, the motion was filed, and I believe you looked at that hearing was held within two days of that. I'm not clear, and it's unfortunate that I don't have a better understanding of how it was pushed through, with no appropriate filings being filed, no appropriate notice being filed. I can't find a motion. I can't find a notice. But what's more curious to me is, on August 8th, the child is ordered to go to Edwardsville, and then one week later, again, without a motion, without notice, there's a new order that the child is now going to a different school, Bethalto. Correct. I mean, are we just walking before the court and getting an order? In some ways, I would agree with you, in that that order with regard to Bethalto Schools, my belief is that stemmed from the order of protection. And of course, I've argued this point in my appeal, which is that that order of protection, the court made no specific findings of abuse against the child, that I guess the allegations were proved, but there was no specific finding that the mother had abused the child. So the ex parte order of protection was granted, subsequently dismissed, and the court, in my view, sua sponte, entered a temporary custody order saying that mom could have no visitation or then supervised visitation after the fact. And because of that, and I think because of those rulings, it gave the opposing side an opportunity to take advantage of that in saying, okay, well, now the child's temporarily in debt, we need to get the child back into dad's school district. So we began this... But when we have a change in custody, don't we have to show a substantial change in circumstances? We do, and we also have to... And I don't see that petition filed anywhere in the record. It is not anywhere in the record. And there were no findings that said temporary custody situation was in the best interest of the child. And that is one major issue that we had argued in this case on our third point of appeal. Being that we've covered that piece, I don't want to continue to go into that issue, because I think Your Honor has significantly pointed out the point that has concerned me from this case for a while. The issue in regard to the court's specific findings within this judgment entered in August. The first one was that it was more than a coincidence that mother's allegations came up about the abuse of the child after the original trial date. My issue with this particular finding by the court, and as I detail in my motion to reopen evidence, there was a motion to set aside the court's judgment, I apologize, was that father specifically testified at trial when asked... At that initial trial. The Guardian and Vitam's report was in favor of mom having sole custody. The custody evaluator had provided a report providing that mom should have sole custody. When I asked that, being that that was the two major pieces of evidence that we put on in regard to custody of the child, would there be any benefit to mom to now fabricate some kind of abuse allegation? Father's testimony was no, there wouldn't be. I think opposing counsel suggests that that's a legal conclusion, but I think that's a reasonable conclusion, a matter of fact, sort of common sense conclusion that we can reach that, no, there wouldn't have been any reason why she would have done this on purpose. She was basically, everything was in her favor. Furthermore, I think... Bear with me, I apologize. I got myself off track a little bit. I think, well, I think I made that point, that father's testimony and to the report of the Guardian and Vitam and the report of Dr. Tompkins. The trial court also made a specific finding that mother would not or had not or would not support a close relationship between father and the minor child. I think the evidence that was presented before the court, and again, this is the evidence... One of the frustrations that I've experienced with this particular case is that the totality of the evidence includes three days of trial. We had trial March 11th and 12th and we also had this other trial date. And what it appears to me in the judgment is that we focused very, very much so on everything that occurred after that original trial date without sort of going back to those particular findings, testimony and issues that came up and were substantial issues that came up during that initial trial. But how did you get to another trial? Why was there another trial? I can't find anything in the record that says, okay, you're going to get another trial. Usually a trial is over. The motion to reopen evidence, open proofs... But that was limited to these protective order. It was, the motion to reopen proofs was so that the opposing counsel could present evidence about mom's false allegations and the belief that these false allegations should be taken under consideration by the trial court in making its decision in regard to custody. Okay, but in the meantime, between March and August of the following year, all these things happened. Custody was changed back and forth, schools were changed back and forth, and then we end up with another whole trial. It can't all be related to this one little petition that has four or five paragraphs. My understanding is that it is, and that's the reason that the court reopened that. And so what the issue was, we began this process of going backwards in time and trying to provide evidence to the court of the allegations as they occurred, what happened, what other possible evidence there might be. I think it opened up, the motion opened up Pandora's box, and I think it really did fail to consider what we knew at the time already, which was, and as I've already stated, these mandated reporters were the ones that had reported it, and had reported one set of incidents that happened in May. Two months later, we have another set of incidents reported by a mandated reporter in July. All of these things being related from the child to these mandated reporters. Additionally, there's some medical evidence from the doctors at St. Louis Children's Hospital, but that's, it is confusing. I don't understand how this became this whole new thing based on this motion, because I do believe that the motion should never have been granted. Considering what the trial court knew at the time, all the evidence was there and presented to the trial court, all we needed was judgment. We needed to get through this. So now it became, the entire focus became everything about this was caused by mother. I think that's, that's where father's position began to be pushed forward, was that this was all mother, and that the trial court needs to know, this is all mom, this is bad, we need to reconsider, you know, all the evidence, because this is all mom. And I think the evidence shows that it wasn't mom. It was, it was, while the trial court made specific findings about the mom coaching the child in doing that, and this was the point we argued on appeal, the court failed to consider that there was these mandated reporters, that the child did make a disclosure in a CAC interview, that the child did make a disclosure to a social worker, and that the disclosure was consistent from person to person and spanned over a two, two and a half month period. I think those are important factors that we have to consider. It's very easy just to say that, oh, mom coaches the child. Look at the other factors. We don't understand, we can't ignore these other pieces of information that are before the court and just simply say, write it off as, oh, this is mom. I think those other pieces of information were left out and were not considered by the trial court. And I think that was a, it's against the manifest weight of the evidence when you look at it in its totality. Other specific findings that we had challenged with regard to this judgment, that the mother had intentionally hid the child from, from a father. I think the trial court in making that, making that determination failed to consider mom's own testimony, and specifically the testimony of Detective Carol Preston, who was involved in this case between the time of the second allegations and whenever the OP and change of custody happened. Mother obviously testified that at the time the allegations were being made, she believed her daughter. She felt helpless, that she may have made a poor choice in the eyes of others, but as mother felt, she had no choice. Her state of mind, which she testified to at trial, was corroborated in Detective Preston's testimony in that she, when speaking to mom, had basically, mom had apologized for her behavior and just explained that she was trying to protect her daughter. So I think it's, it's, it's unfair to say that mother intentionally, I think it's against the evidence to say that mother intentionally hid the child without examining and considering what mom's state of mind was at the time that that, that the issue, the incidents and these issues were arising within this case. Your Honor, my appeal relates to obviously the award of sole legal custody. Our claim is that this was an abuse of discretion against the man who specified the evidence. I think when you look at the totality of this case and the two days of trial, the findings of Dr. Tompkins, specific things about what Dr. Tompkins found about dad not having any sort of appreciation for his effect on the child, things, his beliefs about, you know, theories on psychosomatic illness, that mom causing the child's illness, the fact that Dr. Tompkins in her extensive evaluation found that dad didn't really seem to have a lot of information about this child in her early years, that mom was primarily the one doing all the medication, helping with this, this illness. Thank you, counsel. Counsel? Thank you, Your Honor. And for the audio record, my name is Curtis Blood. I represent Andrew Groschansky, I believe. May it please the court, counsel. Justice Cates, you asked some questions. I'd like to try and answer them. I hope so. One of the problems with this record on appeal is that there were no oral protection files in it. There was a shadow of oral protection stuff going on that isn't in this file. Now, as I believe, it's not my job to present a record, but some of the things that we know about the oral protection cases, we only know because they were mentioned in transcripts. For instance, the allegation by the mother against the father of sexually abusing the child, that's in a transcript. That's an R145-6. The pleading isn't in the record. That's a different file. What was the date on that? That was in May. May, 2012. Yes, so coincidentally, and this is your question, well within the 90 degree window, more like 60 degrees. And of course, that was a very significant issue. I mean, the circuit court couldn't very well dispose of the custody issue until it got to the bottom of the sex abuse or not issue. Well, but that petition was dismissed on July 30th, another supervised visitation for father. I mean, within 30 days between July and August, we have this child going from father to mother to no visitation from mother. I mean, the child is being bounced around like a ball. And it seems to me that when you're moving a child around, you have to have some finding of best interests. And I'm assuming it's because of all these orders of protection. July 30th, supervised visitation for father, pending the outcome of a DCFS investigation. August 8th, we're putting the children in Edwardsville. Then August 15th, they're going to Bethalto. August 17th, no visitation for mother now. Now we're giving father visitation again. I understand these orders of protection, but we're moving this child around well after the 90 days that the court should have issued an order. And I don't understand how you get to a trial in August. Another trial. Well, first of all, Your Honor, I'll try to answer the question. Okay. And I think there's several in there. First, the allegation of sex abuse against the father was made well within that 90 days. I see. The second trial, if you want to call it that, was by mutual agreement. Both sides had facts they wanted to put on. And the judge put that right in the record. And I quoted it in my brief. With no motions? Well, there was Andrew's motion to reopen the proof. But that motion was related to these protective orders. It wasn't to put on a whole new trial. Right? I mean, if I looked at the motion. At that point, that was true, Your Honor. But a lot of things happened. Actually, there's five events I'd like to discuss. Right. It's almost like the court's waiting to see what happened before we're making a final judgment. That's what it seems. I would assume that whether to wait or proceed, whether to admit new evidence or not, in a case like this, comes down to best interest of the child. Is it in the best interest of the child for the court to see how things pan out? Is it in the best interest to get right to it? Is it in the best interest of the child to hear more evidence? It's evidence about the best interest of the child? But I think the Marriage and Dissolution Act would disagree with you. I think the idea is to not have temporary custody orders, but we have some final judgment so that people can get along with their lives. And don't you think that's why we have the two-year rule? Or not? Well, I'm not sure I'm answering this. I'm answering your question. But the There was one change of custody from mother to father. One change. That was change of temporary custody. And at the time that the circuit court made it, the circuit court found that the mother posed a threat to the child. Found after hearing the evidence. And that was eventually dismissed? Not to my knowledge, Your Honor. I'm asking, was it or not? That stood. And the judge relied on the facts that were proved that led to that finding in final judgment. I mean, what happened at that point? What caused that order? I mean, the finding that the mother was a threat to the child was a big deal. And the judge relied on it in final judgment on custody. Does that help? Everything you have said helps, yes. I beg What I'd really like to do, subject to questions, of course, is go through five events that the circuit court mentioned in the custody judgment and that are proved in the record. And I'd just like to make sure the court understands them. And the first one is Angela's petition for an emergency order of protection alleging that Andrew sexually abused the child. That's room. The child was interviewed by Child Advocacy Center, by DCFS, and by at least two police departments. Angela showed the Bethalto police a video on her cell phone showing the child saying what essentially was an accusation of sexual abuse against the father. So the transferred the contents, the video contents of the cell phone, but there was a second video. And in the second video, the mother was coaching the child on what to say in the video that Angela did show. By the time that this was heard in circuit court, this had all panned out. Andrew was not charged. Neither the police, the state's attorney, or DCFS objected to Andrew being alone with the child. They had completed their investigation, made their decision, but the police, Bethalto police did consider charging Angela with making a That's the first event. Second event, as a result of mother's false report, Andrew missed his visitation. And at the end of the hearing, trial court granted Andrew four weeks of make-up visitation for what he missed. Instead, mom hid the child. He didn't get his visitation. She admitted she was defiant about it, really. Number three, mom forced her way into dad's home and carried off the child. While dad called 911, she took the child to a van, buckled her in, and by then, dad had gotten to where he could block mom from getting into the driver's seat while the police arrived. The upshot of that was the police arrested her for trespass and for resisting arrest and carved her off in handcuffs. Those charges were still pending at the time of the last hearing. That's when the circuit court found that mom posed a threat to the child, and that's when dad became the primary temporary custodian. Four, I don't want to mix up mine, at a visitation exchange, mom spit in dad's face at a visitation exchange. She admitted it. She was defiant about it. And fifth and finally, mom claimed to the guardian ad litem that dad was responsible for the child's teeth being knocked out. They said it's growing in. The point is none of this behavior by mom is in the child's best interest. Meanwhile, we've got this changed temporary custody, now permanent, but at the time of the judgment, there was no dispute. The child was thriving in dad's care, healthy and doing well in school. The order of appeal, the court wrote and repeated on reconsideration, the child's best interest was that dad be the sole custodian. He mentioned that he'd gone through the statutory factors and all relevant factors, and he discussed some of 12-page order. The court wrote in particular that mom would not and had not fostered a close relationship between child and father. Her attitude toward him was confrontational at best, and she overreacts to the smallest matters. And the court said Andrew's been guilty of overreacting too, but of the two, he's far more stable and responsible. The court said Andrew was the meaner of the parties and mentioned absorbing the parties over an extended period of time. The other issues, I think they're just make way. I don't see how they're significant here. The trial court made no significant errors, and I'd submit any error that it did make. It's harmless. One thing it had to decide was who had custody. The fact that a couple of people at the hospital wrote down sex abuse in their reports only shows that they were doing their job. They're mandated reporters. They had to report what they were told, but there was never any other evidence. After all these interviews with Again, the court observed the parties over an extended period of time. You learn what kind of people they are. It's no fun being a dissolution court. There's pressure on you. The court got to see over an extended period of time how they react to things, what kind of people they are, and get some idea what kind of parents they were. I think the court understands our position, and if there are no questions, we ask this court to affirm custody judgment. No questions. Thank you, Counsel. Counsel? I do want to respond to a couple of specific things stated by Counsel in his argument. First, the video that Counsel suggested. There were two videos. One was not presented. One was, I guess, maybe hidden away or something. Both videos were presented. They are included among the exhibits that were forwarded to the appellate court. This did include the initial video of my client, and in her testimony, Trout explained why it was she began to record it. I can tell you in my experience as a family law attorney, clients do record things. It may not be the most best thing to do, but when they're thinking at the time, I need to record this, that was to say what she wants to say, I'll give it to her, she can say it into the phone. Those were the two recordings. So there was never any active subterfuge not to include those two recordings. They were heard at trial. But that doesn't negate the fact that two months later, another allegation was made that Daddy had bit me, and the same allegation, the continued allegation of Daddy tickles my vagina and I laugh, but it's not funny, was repeated again two months later. So again, I think that the totality of the evidence when you're looking at it, you can't ignore these two other events that happened after the fact. We had the video. We had a mandated reporter. There was a two-month period. We had another report by the child. The mandated reporter does the interview. That information is forwarded to the CFS. I don't think those things can be ignored. It's a two-month period to say that Mom is in control of the child and what the child is saying when she's in the room with CAC interviewers, with social workers, and Mom isn't present. I think that's a stretch. The detective's discussion about the false report to Bethalto, I think the testimony of the detective at the trial was significant in that when I questioned him about whether or not Mom made a false report, he basically admitted, no, she never made a false report. What he believed was that the report was false and that he was considering forwarding up the shame to additional people. Never that Mom had made a false report, but that he just believed that it was false. In regard to Angela forcing her way into Dad's home, I think that's an issue of a fact that was disputed at the order of protection hearing. My client says that the child ran to her. She picked her up. Dad says, I'm calling the police. There's a conversation. She takes and puts the child in the van and waits for the police to arrive. Yes, Angela was charged with trespassing, resisting arrest. I'd like to say those charges are still pending in Madison County since August of 2012. I'm not really sure what to say about those particular charges and the veracity of those charges. Mom claimed to the GAO that she showed a picture of knocking out the teeth. I think Angela testified at trial and clarified that issue specifically was not that she was claiming that Dad broke the teeth out. It's that the child had lost the teeth. She wanted Dad to take the child to the orthodontist because the teeth were not growing in correctly. That was the purpose of showing the guardian had lied under the picture. Why the guardian had not come to that conclusion, I'm not clear. Angela testified to it at trial, and I think that was provided clarity at that point. I think in our final point on the – our eighth and final point, all those issues that I've raised in that regarding the initial custody evaluation, Dad saying Mom's crazy, Grandma's crazy, Dad – I mean, the spitting in the face incident, Angela testified that was as a result of when she asked Andrew to provide – reciprocate this extra time, he basically said no. She provided this. As if emotional, out of frustration, yes, absolutely. Not a good decision, absolutely. But these two, obviously, I think that just only signifies the issue that this was always going to be an issue of sole custody to one person or the other. And I think that when you look at the totality of the evidence, all of those things were said by Dad. The threats against Mom that, you know, Dad made in that initial trial. Cannibal mothers, you know, like, you know, cause cannibal children or, you know, all these sort of crazy comments that were made by Andrew during the course of this case. Look at the totality of things. Mom being involved in the school. Andrew not going to the school functions prior to in preschool. Andrew not supporting the, you know, signing of the reading report so that the child could get her incentive through school because he doesn't believe it's important to incentivize children reading in that way. There's just a lot of things here that the court left out and that focus became that issue once that motion for reopen recruitment was granted, all of the focus became on what these events were. And I think the court just absolutely left out significant pieces of evidence, did not review those pieces of evidence. And I think that in these particular cases, when we make no findings and we're changing custody, making no findings about the best interest of Children, making no specific findings of abuse on the record. I think we have to look at this a little bit more closely and asking the court to grant our motion for a new trial and or reverse the trial court's judgment. Thank you. Thank you, Counsel. We appreciate the brief arguments. Counsel will take the case under advisement. There are no further oral arguments before the courts.